HENRY BARRAGAN AND CAROL BARRAGAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Barragan v. Commissioner
Docket No. 15680-90
United States Tax Court
T.C. Memo 1993-92; 1993 Tax Ct. Memo LEXIS 85; 65 T.C.M. (CCH) 2091; March 17, 1993, Filed *85 For petitioner: Russell P. Briesacker and Victor L. Smith. For respondent: Marilyn Devin, Dwight M. Montgomery, and Joseph K. Fletcher III. COHEN
COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Additions to Tax
Sec.
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(b)(1)
6653(b)(1)(A)
6653(b)(2)
6653(b)(1)(B)
6661(a)
1983
$ 309,380
$ 154,690
--  50% of the
--
$ 77,094
interest on
$ 309,380
1984
280,958
143,415
--  50% of the
--
69,833
interest on
$ 286,829
1985
209,672
107,988
--  50% of the
--
52,418
interest on
$ 215,975
1986
50,867
--  $ 47,434
--
50% of the
12,717
interest on
$ 63,245
1987
40,462
--  32,782
--
50% of the
10,116
interest on
$ 43,709
In the alternative, if fraud additions to tax are not sustained:
Additions to Tax
Sec.
Sec.
Sec.
Sec.
Sec.
Year
6651
6653(a)(1)
6653(a)(1)(A)
6653(a)(2)
6653(a)(1)(B)
1983
--
$ 15,469
-- 50% of the
--
interest on
$ 309,380
1984
$ 70,639
14,341
-- 50% of the
--
interest on
$ 286,829
1985
52,934
10,799
-- 50% of the
--
interest on
$ 215,975
1986
14,561
--  $ 3,162
--
50% of the
interest on
$ 63,245
1987
6,641
--  2,185
--   50% of the
interest on
$ 43,709
*86 All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Based on records produced by petitioners during trial preparation, respondent adjusted the deficiency amounts asserted; the new amounts are as follows: 1983
1984
1985
1986
1987
Deficiency:
$ 72,586
$ 71,929
$ 171,248
$ 32,019
$ 65,188
The additions to tax in issue would be reduced proportionately. After concessions by the parties and after abandonment of certain issues by petitioners, the issues for decision are: (1) Whether respondent's method of reconstructing petitioners' gasoline sales and taxable income from the operation of their Shell Oil Company (Shell) service stations for 1983, 1984, 1985, 1986, and 1987 is reasonable; (2) whether petitioners are entitled to additional Schedule C deductions for 1983 through 1987 for cash shortages; (3) whether any underpayment of tax by petitioners for 1983 through 1987 was due to fraud with intent to evade tax by Henry Barragan (petitioner), thus extending the period of limitations for the 1983 through 1985 deficiency notices, or whether the *87 additions to tax for negligence are applicable; and (4) whether petitioners are liable for the additions to tax for substantial understatements of tax pursuant to section 6661 for 1983 through 1987. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioners resided in Los Angeles, California, at the time their petitions were filed. Petitioners are husband and wife and filed joint Federal income tax returns, Forms 1040, for 1983 through 1987. Beginning in 1969, petitioners owned and operated Shell gasoline stations in Los Angeles, California. The chart below depicts the stations owned by petitioners in all or part of the years indicated: Gasoline Station Location
1983
1984
1985
1986
1987
Alosta:
1860 East Alosta
X
X
X [1] *88 --
--
Glendora, CA
Garvey:
12999 East Garvey Ave.
X
X
X
X
X
Baldwin Park, CA
Temple:
3177 Temple Hwy.
X
X
X
X
X
Pomona, CA
Arrow:
110 West Arrow Hwy.
X
X
X
X
X
Covina, CA
San
Bernardino:
871 West San
--
X [2]
X
X
X
Bernardino Rd.
Covina, CA
During 1983 through 1987, the principal source of gross sales receipts from petitioners' gasoline stations was the sale of gasoline and diesel fuel although, beginning in 1984, petitioners also operated minimarts at some of their stations and, beginning in 1985, some of the stations sold lottery tickets. For the years in issue, all of the gasoline and diesel fuel sold by petitioners at their gasoline stations was purchased from Shell. Petitioner managed the Shell gasoline stations, and his wife worked at those stations during all of the years in issue. The gasoline stations were open 365 days a year, and there were three operating shifts per day. Petitioner telephoned the stations every day to get meter readings and to make himself aware of the gasoline sold during a particular day at each station. Petitioner also placed orders for Shell gasoline and paid the bills for the Shell gasoline. Unreported Income
In July 1986, the State of California instituted a new procedure for collecting the sales tax on gasoline whereby the oil companies selling the gasoline *89 to service stations made prepayments of tax based on gallons sold. Under the new procedure and after July 1986, petitioners reported to the State of California the gallons of gasoline sold to customers, and Shell reported to the State of California the gallons of gasoline purchased from Shell by petitioners. For California State sales tax purposes, the volume of gasoline sales to customers, as reported by petitioners, and the volume of gasoline purchases from Shell, as reported by Shell, increased substantially as a result of the new requirements. IRS Audit and Problems with Petitioners' Recordkeeping
Increases in petitioners' reported gasoline purchases led to a California State Board of Equalization investigation into petitioners' recordkeeping in March 1988. Through an information-sharing agreement between the Commissioner and the State of California, the Internal Revenue Service (IRS) was alerted that petitioners were underreporting gross receipts. Thereafter, the IRS instigated an audit of petitioners' 1983 through 1987 Federal income tax returns. Petitioners' Federal income tax returns for 1983 through 1987 were prepared by petitioner's brother-in-law, Arthur F. *90 Zepeda (Zepeda). Zepeda signed the 1985, 1986, and 1987 returns as preparer but did not sign the 1983 and 1984 returns. Zepeda owned Art Zepeda and Associates, an E.K. Williams accounting franchise. Petitioners allowed Zepeda to take out a deed of trust on their home in order for Zepeda to open the E.K. Williams franchise, and petitioners allowed Zepeda to live rent free in one of their homes while the business was getting started. Zepeda sold the accounting franchise to Elias Shahin in August 1987. When the IRS audits of petitioners' returns were initiated, documentation for the returns was requested from Zepeda. The documentation received was incomplete and in disarray. Zepeda committed suicide on June 13, 1989, shortly after the audits began. Subsequent to the suicide, IRS attempted to obtain documentation for the returns from petitioners. Petitioners initially did not provide any of their original business records to respondent, claiming that Zepeda had kept all of petitioners' original records, that petitioners' records were commingled with records of other clients of Zepeda, and that the records were unavailable because they were being used in the State Board of Equalization *91 audit. Although petitioner was the administrator of Zepeda's estate, petitioners also claimed that the records were unavailable because they were "tied up" in estate proceedings. The records received by the auditor for the California State Board of Equalization in his audit of petitioners' sales tax were fragmentary; he received some daily sales records, some profit and loss statements, and some vendors' invoices. He never had access to a complete set of records. The records presented to respondent in this case were likewise incomplete. No "daily books" are available for 1983 through 1986, and only for 1987 was a set of "daily books" made available to respondent. The 1987 "daily books" were incomplete and were maintained on a sporadic basis, i.e., every 5 days or weekly or biweekly rather than daily. Reconstruction of Income by Respondent
Lacking complete records, respondent reconstructed petitioners' income based on the purchases of fuel reported by Shell. The Shell records indicated the volume and price charged for each grade of gasoline and diesel fuel purchased by petitioners from Shell for each of petitioners' gasoline stations during the years in issue. The Shell *92 records were used to determine cost of goods sold in respondent's computation of petitioners' income. In addition, because petitioners' records lacked sales data, respondent used the Shell records of gallons of fuel purchased by petitioners to compute the sales receipts. This was accomplished by taking the number of gallons of each grade of Shell gasoline, except diesel, and multiplying it by the average retail price for that type gasoline at that time. The retail gasoline prices for 1985, 1986, and 1987 were obtained by respondent from a Los Angeles, California, agency, Lundberg Survey, Incorporated (Lundberg), which publishes the Lundberg Survey. The Lundberg Survey is a listing of gasoline prices, based on samples of actual gasoline prices, collected biweekly by independent reporters under contract to Lundberg who visually inspect the posted gasoline prices at specific stations. In the Los Angeles area, Lundberg's gasoline price averages for the years in issue were based on actual gasoline prices gathered on approximately 1,600 of the 6,000 to 7,000 dealers in the area. For 1985, 1986, and 1987, respondent calculated monthly gasoline prices by using average gasoline prices *93 for the 229 Shell stations in the Lundberg Survey. For 1983 and 1984, respondent initially used gasoline prices from the U.S. Department of Energy, U.S. Energy Information Administrative data, but, after the deficiency notices were sent, respondent changed to using "tan sheets" from Lundberg. Lundberg's "tan sheets" are biweekly compilations of gasoline price averages, based on raw data similar to the data collected for the Lundberg Survey, but the gasoline price averages are weighted to reflect the market share of the gasoline stations surveyed. For 1983 and 1984, respondent calculated monthly gasoline prices from the Lundberg Survey "tan sheets" using the Los Angeles area average gasoline prices. Diesel fuel prices were calculated by respondent only for the San Bernardino station and only for 1985, 1986, and 1987. Diesel fuel sales were computed by applying an average gasoline markup percentage to petitioners' diesel fuel purchases. Under respondent's computations, as revised for stipulated business expenses, sales taxes, excise taxes, minimart sales, and lottery sales, petitioners understatements of sales receipts, costs of goods sold, and net business profits are as follows: *94 Sales Receipts: As Reported by
Respondent's
Year
Petitioners
Computation
Understatement
1983
$ 1,699,594
$ 5,693,782
$ 3,994,188
1984
2,074,511
6,310,379
4,235,868
1985
3,437,526
8,235,635
4,798,109
1986
4,691,768
5,926,007
1,234,239
1987
5,883,549
6,240,599
357,050
Cost of Goods Sold: As Reported by
Respondent's
Year
Petitioners
Computation
Understatement
1983
$ 1,552,419
$ 5,301,923
$ 3,749,504
1984
1,807,926
5,783,235
3,975,309
1985
3,008,600
7,406,218
4,397,618
1986
4,274,514
5,277,293
1,002,779
1987
5,445,980
5,612,689
166,709
Net Income: As Reported by
Respondent's
Year
Petitioners
Computation
Understatement
1983
$ 21,152
$ 178,149
$ 156,997
1984
62,767
228,720
165,953
1985
46,869
411,738
364,869
1986
67,565
281,930
214,365
1987
3,628
193,969
190,341
In addition, material items were omitted from petitioners' Federal income tax returns. In 1983, petitioners paid $ 918,465 to Shell for 1,011,192 gallons of gasoline to be sold at their Temple station, yet they did not report any purchases or gross receipts as to their Temple station on their Federal income tax *95 return for 1983. In 1984, petitioners paid $ 52,418 to Shell for 61,161 gallons of gasoline to be sold at their San Bernardino station, yet they did not report any purchases or gross receipts as to their San Bernardino station on their Federal income tax return for 1984. Pioneering
Pioneering is a term used in gasoline marketing that generally means selling at a low profit margin for a period of time in order to attract more customers, thereby increasing sales volume. A typical period of "pioneering" lasts from 3 to 9 months. Shell recommended that its dealers use the "pioneering" technique to increase sales at their stations. Cash Shortages
The following amounts were listed on petitioners' tax returns and have been agreed to by respondent as the appropriate cash shortage expense: $ 1,674 in 1983, $ 1,437 in 1984, $ 1,057 in 1985, $ 5,873 in 1986, and $ 18,442 in 1987. Petitioner prepared handwritten summaries of moneys allegedly lost due to employee mistakes at the register and customers who drove off without paying. The amounts that were handwritten by petitioner were all shortages, never overages. Underlying documentation for the summaries was not maintained. *96 OPINION Reconstruction of Income
The first issue is whether respondent's method of reconstructing petitioners' gasoline sales and taxable income from the operation of their Shell service stations for 1983, 1984, 1985, 1986, and 1987 is reasonable. Section 6001 requires all taxpayers to maintain sufficient records to determine their correct tax liabilities. When taxpayers fail to keep adequate records, the Commissioner is authorized to determine the existence and amount of the taxpayers' income by any method that clearly reflects income. Sec. 446(b); Holland v. United States, 348 U.S. 121 (1954); Mallette Bros. Const. Co. v. United States, 695 F.2d 145, 148 (5th Cir. 1983); Webb v. Commissioner, 394 F.2d 366, 371-372 (5th Cir. 1968), affg. T.C. Memo. 1966-81. The reconstruction of income need only be reasonable in light of all surrounding facts and circumstances. Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970); Schroeder v. Commissioner, 40 T.C. 30, 33 (1963). The Commissioner is given *97 latitude in determining which method of reconstruction to apply when taxpayers fail to maintain records. Petzoldt v. Commissioner, 92 T.C. 661, 693 (1989). Once the Commissioner has reconstructed taxpayers' income, the burden is on the taxpayers to demonstrate that the Commissioner's determination is erroneous. Mallette Bros. Const. Co. v. United States, supra at 148. Petitioners have conceded that gross receipts and costs of goods sold were unreported on their Federal income tax returns for the years in issue. Respondent reconstructed petitioners' Shell gasoline service station gross receipts and costs of goods sold because petitioners' books and records were incomplete and disarray. As set out in our findings, respondent used Shell records and statistical information on gasoline prices charged at other California Shell gasoline stations to reconstruct petitioners' income. The Court has found the use of statistical indexes appropriate in a number of cases. Pollard v. Commissioner, 786 F.2d 1063, 1066 (11th Cir. 1986), affg. T.C. Memo. 1984-536 (the court *98 allowed respondent's income determination based on Bureau of Labor statistics that indicate the cost of living in a particular geographical area); Moore v. Commissioner, 722 F.2d 193, 196 (5th Cir. 1984), affg. T.C. Memo. 1983-20 (the court allowed respondent's use of the Consumer Price Index to determine income); Edwards v. Commissioner, 680 F.2d 1268, 1270-1271 (9th Cir. 1982) (the court allowed respondent to determine income using the Consumer Price Index and the taxpayer's prior returns); Giddio v. Commissioner, supra (the Court validated respondent's income determination that was based on the Bureau of Labor statistics on the cost of supporting a family the size of the taxpayers' family). Here, the statistics used by respondent were gathered by an independent agency, Lundberg, based on observations of California gasoline stations. Petitioners' Temple station was among those stations surveyed from 1985 through 1987. After trial, respondent recalculated the gross sales receipts for the Temple location based on those actual gasoline prices in the Lundberg *99 Survey. Petitioners argue that petitioners' stations sold gasoline at prices substantially lower than the average gasoline price in the Lundberg Survey. In addition, petitioners claim that most of their stations were subject to fierce price competition and that all stations engaged in "pioneering", resulting in gasoline prices that were substantially less than the average Shell station gasoline prices in the Lundberg Survey. Finally, petitioners assert that the average Shell gasoline prices in the Lundberg Survey were higher than petitioners' actual gasoline prices because the Lundberg Survey included in its averages stations that have both full-service and self-service islands, and petitioners maintain that such stations charged more for their self-service gasoline than self-service only stations. Petitioners' arguments are unpersuasive. To illustrate their point, Shell's area manager, Jerry Harkins (Harkins), and petitioner used the Lundberg Survey to identify "competitors" for petitioners' Alosta, Garvey, Arrow, and San Bernardino stations. No competitor was chosen for petitioners' Temple station because that station itself was set out in the detail of the Lundberg Survey. *100 The "competing" stations chosen included Thrifty, 7-Eleven, Arco, and USA. Those stations had gasoline prices that were, on average, lower than the gasoline prices for Shell stations in the Lundberg Survey. Petitioners argue that they sold fuel at the same or slightly higher prices as the "competing" stations. However, the Exxon station across the street from petitioners' San Bernardino station was not chosen as a competitor because Harkins "didn't know it was [in the Lundberg Survey]." That Exxon station had gasoline prices that were, on average, higher than the Lundberg Survey's Shell gasoline prices. Petitioner is not entitled to use the lower of the Lundberg Survey prices or a few known actual prices; his overall prices may well have been higher. In 1987, the only year for which petitioners maintained a set of daily books and the only full year for which Shell, as well as petitioners, reported the gasoline usage, respondent's computations using the Lundberg Survey actually yielded gross gasoline receipts (exclusive of minimart and lottery sales) lower than the figures reported on petitioners' Schedules C. We are not persuaded by the testimony of Harkins that some of petitioners' *101 stations practiced pioneering methods for up to 3 years, rather than for the normal 3- to 9-month period, because the purchasing data from Shell does not show large fluctuations in gasoline purchases by petitioners' stations. For example, Harkins testified that the Alosta station engaged in pioneering during 1983 and consequently quadrupled its volume of sales, but Shell's records for Alosta did not indicate any such large fluctuations. For 1985 through 1987, because respondent's computations used Shell gasoline prices and because Shell encouraged pioneering by all dealers, the lower gasoline prices for pioneering would be reflected in the Shell average gasoline prices. For 1983 and 1984, petitioners did not provide evidence to substantiate the pioneering claims. As noted by respondent, for the diesel fuel sales, respondent's income reconstruction using an average markup has been approved by the Court in at least three other cases involving the underreporting of gasoline station income. Stafford v. Commissioner, T.C. Memo. 1992-637; Frank v. Commissioner, T.C. Memo. 1982-214; Grasavage v. Commissioner, T.C. Memo. 1979-89. *102 Petitioners have not brought forth evidence that would refute the reasonableness of the diesel fuel markup. As a procedural matter, respondent seeks to increase the deficiency against petitioners for 1987 for minimart and lottery ticket income not included in the original notice of deficiency. The Court will not entertain an issue that has not been pleaded properly and, absent a clear and timely claim by respondent for an increased deficiency, will not enter a decision in an amount greater than was determined in the notice of deficiency. Pallottini v. Commissioner, 90 T.C. 498, 500 (1988); Estate of Petschek v. Commissioner, 81 T.C. 260, 271-272 (1983), affd. 738 F.2d 67 (2d Cir. 1984). Section 6214(a), however, grants the Court jurisdiction to: redetermine the correct amount of the deficiency even if the amount so redetermined is greater than the amount of the deficiency, notice of which has been mailed to the taxpayer, and to determine whether any additional amount, or any addition to the tax should be assessed, if claim therefor is asserted by the Secretary at or before the hearing *103 or a rehearing.
The trial in this case occurred on June 16 and 17, 1992, and was continued to August 24, 1992, to resolve several evidentiary problems. The opening briefs were due November 12, 1992. On November 10, 1992, respondent filed a Motion for Leave to File Amendment to Answer in Order to Conform the Pleadings to the Proof. On December 3, 1992, that motion was denied by the Court as untimely. At this stage of the proceedings, respondent is not entitled to a deficiency greater than that set out in the statutory notice. See Estate of Horvath v. Commissioner, 59 T.C. 551, 556-557 (1973). For the foregoing reasons, we conclude that respondent used reasonable methods to reconstruct petitioners' gasoline sales income for 1983 through 1987. Respondent's revised calculations of net business profits shall be included in the Rule 155 computation, except for 1987, which is limited by the amount in the notice of deficiency. Schedule C Expenses for Cash Shortages
The second issue is whether petitioners are entitled to additional Schedule C expenses for cash shortages. Deductions are a matter of legislative grace. INDOPCO, Inc. v. Commissioner, 112 S.Ct. 1039, 1043 (1992). *104 Taxpayers bear the burden of establishing that they are entitled to the claimed deductions. Rule 142(a); Rockwell v. Commissioner, 512 F.2d 882 (9th Cir. 1975), affg. T.C. Memo. 1972-133. Taxpayers must substantiate the amounts that give rise to claimed deductions and, if the taxpayers do not, respondent is justified in denying the deductions. Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976); Figueiredo v. Commissioner, 54 T.C. 1508 (1970), affd. per order (9th Cir., Mar. 14, 1973). Petitioners contend that they are entitled to cash shortage expenses above the amounts they deducted on their Federal income tax returns. Petitioners assert that, even though the underlying support for their records is not available, petitioner's handwritten summaries of cash shortage have been maintained for 1983 through 1986. Petitioners further assert that these cash summaries were given to Zepeda for preparing the tax returns, but they offer no plausible explanation why the cash shortage summaries do not *105 match the amounts reported on the Schedules C of their tax returns. We conclude that the cash summaries presented by petitioners are unreliable. Our conclusion that petitioners' summaries are unreliable is supported by the history of petitioners' earlier claims for additional interest deductions. The records that petitioners presented to support additional interest deductions contained duplications of deductions already allowed by respondent. After the defects were pointed out, petitioners abandoned their claims for additional interest. No further deductions can be allowed on this record. Fraud
Respondent has asserted additions to tax for fraud as to petitioner. Our determination of fraud will be dispositive of the negligence and statute of limitations issues that are also present in this case. The addition to tax for fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from a taxpayer's fraud. Helvering v. Mitchell, 303 U.S. 391, 401 (1938). Respondent has the burden of proving, by clear and convincing *106 evidence, an underpayment and that some part of the underpayment for each year was due to fraud. Sec. 7454(a); Rule 142(b). This burden is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Webb v. Commissioner, 394 F.2d 366, 377-380 (5th Cir. 1968), affg. T.C. Memo. 1966-81. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud may be proven by circumstantial evidence, because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Estate of Temple v. Commissioner, 67 T.C. 143, 159, 161 (1976); Stone v. Commissioner, 56 T.C. 213, 223-224 (1971). *107 The failure to maintain complete and accurate records is an indication of fraud. Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980), and cases cited therein. A pattern of consistent and substantial underreporting of income for a number of years, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud as to each of the years. Holland v. United States, 348 U.S. 121, 129 (1954); Webb v. Commissioner, 394 F.2d at 379; Marcus v. Commissioner, 70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980). Reasonable reliance on a competent agent may be a sufficient defense to fraud. Davis v. Commissioner, 184 F.2d 86, 88 (10th Cir. 1950), remanding a Memorandum Opinion of the Court dated Sept. 20, 1949. However, such reliance indicates an absence of fraudulent intent only when the agent has been provided with complete information from which an accurate return could have been prepared and there is no other evidence indicating *108 fraudulent intent. Merritt v. Commissioner, 301 F.2d 484 (5th Cir. 1962), affg. T.C. Memo. 1959-172. The courts have developed a number of objective indicators or "badges" of fraud that may establish fraud, including understatement of income, inadequate records, implausible or inconsistent explanations of behavior, engaging in illegal activities, and attempting to conceal illegal activities. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601. Although respondent has the burden of proving an underpayment, where the stipulated and undisputed facts in a case establish underreporting of gross receipts by taxpayers, it is the taxpayers' burden to come forward with evidence that they are entitled to additional offsets or deductions beyond those conceded by respondent. United States v. Marabelles, 724 F.2d 1374, 1379 (9th Cir. 1984); Elwert v. United States, 231 F.2d 928, 933 (9th Cir. 1956). Respondent need only establish that taxpayers received unreported income and *109 that nondisclosure resulted in tax deficiencies. United States v. Campbell, 351 F.2d 336, 338-339 (2d Cir. 1965). Petitioner concedes that the gross receipts and costs of goods sold for petitioners' gasoline station businesses were understated on the Federal income tax returns for each of the years in issue. He contends, however, that respondent has not proven fraudulent intent because petitioner relied on Zepeda, the tax preparer and accountant, to file correct returns. Petitioner claims he did not review the returns before signing but simply looked at the bottom line to see that Federal income tax owing was approximately right. Petitioner also testified that he, at times, signed blank returns that Zepeda later completed and filed. In addition, petitioner contends that the net income was not understated because Zepeda adjusted all expenses by Zepeda's underreporting of gross receipts so that taxable income was in the correct amount. Petitioner managed his daily business closely, yet he testified that he was unable to determine that his gasoline sales, purchases, and net profits were grossly misstated on his Federal income tax returns. Furthermore, *110 petitioner claims that he did not notice that a Schedule C was missing in 1983 for his Temple station, which opened in April 1983 and for which he paid $ 918,465 for 1,011,192 gallons of gasoline in 1983, or that a Schedule C was missing in 1984 for the San Bernardino station, which opened in December 1984 and for which he paid $ 52,418 for 61,161 gallons of gasoline in 1984. Petitioner's claims are not credible. In addition, petitioner was provided with daily books to complete, yet these books are not available for any year in issue except 1987. The 1987 daily records contain substantial omissions and were maintained on a sporadic basis. We conclude that petitioner was not an unknowledgeable businessman but, rather, that he participated in the inaccurate reporting of his business income. He telephoned the stations daily to apprise himself of gasoline sold, ordered gasoline from Shell, paid Shell's bills, and signed the inaccurate Federal income tax returns for 5 years. In addition, petitioner, in the course of his business, apparently filed false State sales tax returns. A taxpayer's dishonesty in business transactions or willingness to defraud others may indicate a willingness *111 to defraud the Commissioner. Solomon v. Commissioner, 732 F.2d 1459, 1462 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603; McGee v. Commissioner, 61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). Petitioner testified that he supplied complete and accurate daily books to Zepeda; that he assumes that Zepeda deliberately ignored those figures and substituted lower ones without petitioner's knowledge; that he signed all of the returns without noticing substantial understatements of actual sales and costs; that, for over 5 years, this practice continued without petitioner's ever realizing what was going on; and that Zepeda kept and lost most of petitioners' tax records for 1983 through 1986. This sequence of events is not credible. In addition, there is no reliable evidence that Zepeda was supplied with complete information from which accurate returns could have been prepared. Considering the entire record, we conclude that respondent has proven by clear and convincing evidence that the entire underpayments of tax, as adjusted by the parties' concessions, *112 for the years in issue were due to fraud on the part of petitioner. We hold that petitioner is liable for the additions to tax under section 6653(b). A related issue is whether petitioners are liable for additions to tax for negligence or disregard of rules or regulations under section 6653(a). These additions to tax are set forth in the alternative to the additions to tax for fraud as to petitioner. Because we are holding that petitioner is liable for the additions to tax for fraud, the Court need not address the additions to tax for negligence as to petitioner. Without considering the gravamen of the additions to tax pursuant to section 6653(a) as to Mrs. Barragan, who filed joint returns with her husband for 1983, 1984, 1985, 1986, and 1987, and because we are holding petitioner liable for the additions to tax under section 6653(b) for those years, the Court will not apply the additions to tax under section 6653(a) as to Mrs. Barragan. See Alexander Shokai, Inc. v. Commissioner, T.C. Memo. 1992-41; Minter v. Commissioner, T.C. Memo. 1991-448; Congelliere v. Commissioner, T.C. Memo. 1990-265; *113 Finally, because we conclude that the underpayment for 1983 through 1987 is attributable to petitioner's fraud, the statute of limitations does not bar assessment of the deficiencies or additions to tax for 1983, 1984, and 1985 as to petitioner. In addition, proof of petitioner's fraud also prevents the running of the period of limitations as to Mrs. Barragan with respect to the liability on their joint returns. Ballard v. Commissioner, 740 F.2d 659, 663 (8th Cir. 1984), affg. on this issue T.C. Memo. 1982-466; Hicks Co. v. Commissioner, 56 T.C. 982, 1030 (1971), affd. 470 F.2d 87 (1st Cir. 1972). Substantial Understatements
The final issue is whether petitioners are liable for the section 6661 additions to tax for substantial understatements of tax for 1983 through 1987. Section 6661(a) provides for an addition to tax if there is a substantial understatement of income tax. The amount of the section 6661 addition to tax for additions assessed after October 21, 1986, is equal to 25 percent of the amount of any underpayment attributable to a substantial understatement. *114 Pallottini v. Commissioner, 90 T.C. 498, 501-502 (1988). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). The understatement is reduced if it is based on substantial authority or is adequately disclosed on the return or in a statement attached to the return. Sec. 6661(b)(2)(B). Petitioners' understatements for 1983 through 1987 are neither based on substantial authority nor adequately disclosed on their returns or in a statement attached to their returns. We, therefore, sustain respondent's section 6661 determinations for the years in issue. Petitioners have complained that respondent refused to issue any summons for records, refused to give petitioners an appellate hearing, delayed stipulations of facts, refused to settle, and disregarded the facts in this case in an attempt to secure a favorable ruling that would allow respondent to use the Lundberg Survey in future cases. These arguments are not germane to the resolution of the issues in this case and are therefore disregarded. To reflect the foregoing and concessions of the parties, *115 Decision will be entered under Rule 155. Footnotes
1. 1. Closed in Aug. 1985.↩
2. 2. Opened in Dec. 1984.↩