T.C. Memo. 2000-317

UNITED STATES TAX COURT

DIESEL COUNTRY TRUCK STOP, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5863-97.                    Filed October 6, 2000.

        P operated a truck stop that sold diesel fuel and
engaged in several other business activities.

        1. <u>Held</u>:  P underreported its income from the sale of
diesel fuel.  Amounts determined.

        2. <u>Held</u>, <u>further</u>, P's disputed deductions for
automobile and rental expenses are disallowed.  Burden of
proof.

        3. <u>Held</u>, <u>further</u>, P is liable for an accuracy-related
penalty under sec. 6662(a), I.R.C. 1986, negligence, etc.

Steve Khachatourian (an officer), for petitioner.

<u>Dale A. Zusi</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHABOT, Judge:  Respondent determined a deficiency in corporate income tax and an accuracy-related penalty under section 6662(a)[1] (negligence, etc., and substantial understatement of income tax) against petitioner for the fiscal year ending June 30, 1990, in the amounts of $337,339 and $67,468, respectively.

After concessions[2] by both sides, the issues for decision are as follows:

_____

[1]Unless indicated otherwise, all subtitle and section references are to subtitles and sections of the Internal Revenue Code of 1986 as in effect for the year in issue.

[2]The following table shows petitioner's reported amounts and respondent's adjustments and concessions as to petitioner's unreported income from diesel fuel sales:

| Document Or Statement | Gross Receipts | Cost of Goods Sold | Gross Profit |
|---|---|---|---|
| P's tax return--totals | $4,152,428 | $3,463,255 | $689,173 |
| P's P & L statement--diesel | 3,340,825 | 2,959,767 | 381,058 |
| Notice of deficiency--adjustments | + 1,548,766 | + 670,311 | + 878,455 |
| Respondent's opening statement, brief--adjustments | + 877,765 | + 82,692 | + 795,073 |

The parties agree that the adjustments to gross receipts and cost of goods sold relate solely to petitioner's diesel fuel activity.

On its tax return, petitioner claimed a $101,517 rent deduction.  In the notice of deficiency, respondent allowed $5,517 and disallowed $96,000.  At trial, respondent conceded $10,000 of the $96,000 disallowance, increasing to $15,517 the allowed rent deduction.  On its tax return, petitioner claimed a $29,877 car/truck expenses deduction.  In the notice of deficiency, respondent disallowed the entire amount.  On answering brief, petitioner concedes $14,657 of the claimed amount.

(1) Whether, and if so then to what extent, petitioner understated its gross income (gross receipts less cost of goods sold) from the sale of diesel fuel;

(2) Whether, and if so then to what extent, petitioner is entitled to claimed section 162 deductions for certain expenses; and

(3) Whether, and if so then in what amount, petitioner is liable for an accuracy-related penalty under section 6662(a).

FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

At the time the petition was filed, petitioner was a corporation with its principal place of business in Le Grand, California.

1. Background

During petitioner's fiscal year ending June 30, 1990 (hereinafter sometimes referred to as petitioner's fiscal 1990): petitioner was a C corporation; Serop Khachatourian, also known as Steve Khachatourian (hereinafter sometimes referred to as Steve), and Andranik Khachatourian, also known as Andy Khachatourian (hereinafter sometimes referred to as Andy),

Steve's brother, were petitioner's sole shareholders;[3] Steve was petitioner's president and was responsible for petitioner's day-to-day operations; and petitioner operated a truck stop that sold diesel fuel and gasoline, and featured a minimart and a coffee shop.

## 2. Petitioner's Books and Records

### A.  Fuel Pump Computer Tapes

During a mid-1988 Federal excise tax audit of petitioner by Henry Hart (hereinafter sometimes referred to as Hart), Hart asked Steve to show Hart the fuel pump computer tapes that underlay petitioner's Daily Sales Records (hereinafter sometimes referred to as DSR's), discussed infra.  Steve told Hart that the underlying fuel pump computer tapes were destroyed after the information on those tapes was recorded on a DSR.  On June 28, 1988, Hart asked to see and was shown the fuel pump computer tape for June 27, 1988.  Hart compared this fuel pump computer tape to the DSR and found that the June 27 fuel pump computer tape showed about $200 more in diesel fuel sales than was shown on the DSR.

---

[3]Although Andy apparently figured in petitioner's activities during petitioner's fiscal 1990, neither side believed that he was important as a source of information in the instant case. Accordingly, the Court concluded, and announced at the start of the trial, that Andy's absence from the trial does not give rise to any inference under Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947); see United States v. Rollins, 862 F.2d 1282, 1297-1298 (7th Cir. 1988); Kean v. Commissioner, 469 F.2d 1183, 1187-1188 (9th Cir. 1972), affg. on this issue and revg. on another issue 51 T.C. 337, 343-344 (1968).

In 1984 or 1985, petitioner became a client of Sahag Bedevian (hereinafter sometimes referred to as Bedevian), who provided income tax and bookkeeping services to petitioner. Steve was petitioner's primary contact with Bedevian. Bedevian developed the DSR form for Steve to track petitioner's income and bank deposits. Bedevian advised Steve to keep all fuel pump computer tapes and records relating to diesel fuel sales in a safe place. Bedevian told Steve that if petitioner were audited then the auditor would need fuel pump computer tapes and records. Steve did not provide the fuel pump computer tapes to Bedevian. Bedevian prepared the tax return for petitioner's fiscal 1990, which Bedevian signed as tax return preparer on September 10, 1990. This tax return was filed on September 20, 1990.

In January or February of 1991, Grey Roberts (hereinafter sometimes referred to as Roberts), a C.P.A., replaced Bedevian as petitioner's accountant. Roberts was petitioner's accountant for about 3½ years. During his work with petitioner, Roberts dealt primarily with Steve. When Roberts became petitioner's accountant, he received petitioner's records from Bedevian. The records Roberts received did not include any fuel pump computer tapes. Steve did not provide fuel pump computer tapes to Roberts until after Andy filed a lawsuit against Steve and petitioner; that lawsuit was filed at some point after the beginning of the income tax audit that led to the instant case. At some point

during Andy's lawsuit, petitioner changed its methodology for reporting sales and at that time Steve began giving the fuel pump computer tapes to Roberts.  Before petitioner changed its method for reporting sales, Roberts asked Steve for the fuel pump computer tapes and was told by Steve that these tapes had been destroyed.

Roberts represented petitioner in the audit of petitioner's fiscal 1990 income tax, hereinafter sometimes referred to as the income tax audit.  The income tax audit began around mid-1992. During the income tax audit, Roberts gave petitioner's bookkeeping records to respondent and met with a revenue agent two or three times.  During the income tax audit, the revenue agent gave to Roberts a form that asked, among other things, how many gallons of diesel fuel petitioner sold each month.  Roberts gave the form to Steve.  Steve responded that petitioner sold 200,000 gallons per month.

### B. Monthly Inventory Reconciliation Sheets

Petitioner's records include Monthly Inventory Reconciliation sheets, hereinafter sometimes referred to as MIR's, which petitioner used to track diesel fuel inventory. Petitioner's records include a MIR for each month from July 1989 through June 1990, except for December 1989.  Each MIR includes columns for opening inventory, deliveries, closing inventory by dipstick reading, metered sales, and accumulated metered sales.

Each day, petitioner's employees were supposed to measure by dipstick the amount of diesel fuel on hand and record this number on the month's MIR. Steve relied on the MIR's although he did not supervise the actual recording of the readings. The photocopy MIR's submitted at trial are poor quality copies of the original handwritten sheets. The combination of the handwriting and poor copy quality make many of the entries on the MIR's ambiguous.

The monthly totals of metered sales from the MIR's are shown in table 1.

Table 1

| Month | Accumulated Metered Sales (gallons) |
|---|---|
| July 1989 | 411,693 |
| August 1989 | 404,322 |
| September 1989 | 323,721 |
| October 1989 | 393,609 |
| November 1989 | 381,067 |
| December 1989 | No MIR provided |
| January 1990 | 456,197 |
| February 1990 | 485,932 |
| March 1990 | 526,892 |
| April 1990 | 408,502 |
| May 1990 | 443,863 |
| June 1990 | 489,615 |
| Total | [1]4,725,413 |

[1] The accumulated metered sales for the 11 months per the MIR's according to (1) the last entry on each month's MIR is 4,722,681 gallons and (2) respondent is 4,726,984 gallons. The amounts in this table are the Court's addition of the daily entries in the "metered sales" column.

On February 1, 1998, Steve sent a letter to respondent stating that petitioner's diesel fuel purchases and sales for the 13-month period June 1989 through June 1990 totaled 5,543,367 gallons and that the average cost per gallon was $.75. On March 5, 1998, Steve sent a letter to respondent stating that petitioner's diesel fuel sales for the 13-month period June 1989 through June 1990 totaled 5,533,367 gallons. The March 5 letter lists petitioner's diesel fuel sales for each month. The diesel fuel sales per the March 5 letter for each month in petitioner's fiscal 1990 are shown in table 2.

Table 2

| Month | Gallons |
|---|---|
| July 1989 | 371,346 |
| August 1989 | 434,239 |
| September 1989 | 346,989 |
| October 1989 | 352,878 |
| November 1989 | 330,060 |
| December 1989 | 358,748 |
| January 1990 | 555,954 |
| February 1990 | 476,221 |
| March 1990 | 511,870 |
| April 1990 | 414,014 |
| May 1990 | 443,492 |
| June 1990 | 516,143 |
| Total | 5,111,954 |

A comparison of table 1--the MIR's--with table 2, shows that Steve was representing that the MIR's were incorrect for each month for which there is a MIR in the record of the instant case.

For petitioner's fiscal 1990, excluding December 1989, the MIR's show 27,793 fewer gallons of diesel fuel sold than Steve's March 5 letter indicates were sold.

C.  Daily Sales Records

Each DSR covers 1 month of petitioner's daily transactions. Petitioner's records include a DSR for each month from January through June 1990.  Each DSR includes columns for bank deposits, diesel fuel (in gallons), diesel fuel sales, gasoline sales, taxable retail sales, food retail sales, labor, and cash purchases.  Each DSR also includes an extension sheet with columns, written in a different hand, for bank deposits, receipts, and sales.  The photocopy DSR's submitted at trial are poor quality copies of the original handwritten sheets.  The combination of the handwriting and poor copy quality make many of the entries on the DSR's ambiguous.

The monthly totals of diesel fuel sales in gallons and dollars from the DSR's, and the average retail price charged per gallon of diesel fuel that we have calculated based on the DSR's, are shown in table 3.

Table 3

| Month | Gallons | Total Sales | Sales Price/Gallons |
|-------|---------|-------------|---------------------|
| January 1990 | 463,371 | $455,796.91 | $0.984 |
| February 1990 | 476,221 | 444,885.76 | 0.934 |
| March 1990 | 511,870 | 467,379.53 | 0.913 |
| April 1990 | 414,014 | 405,489.03 | 0.979 |
| May 1990 | 443,492 | 414,215.13 | 0.934 |
| June 1990 | 516,143 | 451,989.25 | 0.876 |
| Total/Average | 2,825,111 | 2,639,755.61 | [1]0.934 |

[1]  This is the average sales price per gallon determined by dividing the total sales in the 6 months by the total gallons sold in the 6 months.

A comparison of tables 1, 2, and 3 shows that (1) Steve's March 5 letter matches the DSR's for each of the 5 months February through June 1990, and (2) the DSR for January 1990 shows 92,583 fewer gallons than Steve's March 5 letter and 7,174 gallons more than the MIR for January 1990.

D. Purchase Logs

Petitioner's records include handwritten logs of diesel fuel purchases, hereinafter sometimes referred to as Purchase Logs. The Purchase Logs were kept on a monthly basis and include columns labeled "date", "check date", "check number", "invoice number", "company name", "diesel gal.", "gas gal.", and "amount". The Purchase Logs were maintained by petitioner's employees under Steve's supervision. Petitioner's records include a Purchase Log for each month from July through November 1989. The Purchase Logs for December 1989 through June 1990 may have been confiscated by California authorities under a search warrant.

Petitioner did not explain what date was recorded in the "date" column. The dates in the date and check date columns are not chronological. Rather, the entries in the Purchase Logs are organized sequentially by check number. Some of the entries do not match the corresponding records. For instance, invoice 96087 is recorded in the Purchase Log as having been the purchase of 6,087 gallons of diesel fuel, while the corresponding check shows the purchase of 7,559 gallons of diesel fuel.

The photocopy Purchase Logs submitted at trial are poor quality copies of the original handwritten sheets. The combination of the handwriting and poor copy quality make the Purchase Logs ambiguous in many places. The gallons of diesel fuel purchased that we have calculated and the cost as recorded in the Purchase Logs, and the average cost per gallon that we have calculated are as shown in table 4.

Table 4

| Month | Gallons[1] | Cost[2] | Cost/Gallon |
|-------|-----------|---------|-------------|
| July 1989 | 371,346 | $250,710.67 | $0.675 |
| August 1989 | 434,048 | 303,315.56 | 0.699 |
| September 1989 | 346,989 | 263,080.24 | 0.758 |
| October 1989 | 354,435 | 289,660.00 | 0.817 |
| November 1989 | 333,561 | 276,748.80 | 0.830 |
| December 1989 | 357,096 | 289,204.67 | 0.810 |
| Total/Average | 2,197,475 | 1,672,719.94 | [3]0.761 |

[1] Petitioner's total for the Purchase Logs is 2,194,260.

[2] This includes Federal excise taxes.

[3] This is the average cost per gallon determined by dividing the total cost by the total gallons purchased.

### E. Profit and Loss Statements

Bedevian prepared for petitioner monthly Profit and Loss Statements, hereinafter sometimes referred to as PLS's. Each PLS lists petitioner's operating expenses, income, cost of sales, gross profit, and net profit or loss for the current month and the year to date. Bedevian used the DSR's to prepare the income portions of the PLS's.

Table 5 shows diesel fuel sales net of diesel fuel excise and sale taxes, as set forth on the PLS's for January, February, April, May, and June 1990--the only PLS's introduced as evidence.

Table 5

| Month | Diesel Fuel Sales |
|-------|-------------------|
| January 1990 | $327,035 |
| February 1990 | 313,935 |
| April 1990 | 290,546 |
| May 1990 | 292,159 |
| June 1990 | 311,840 |
| Total | 1,535,515 |

On petitioner's fiscal 1990 tax return it reported gross receipts, cost of goods sold, and gross profit in gross; i.e., not broken down according to the different activities carried on at its truck stop.  The amounts so reported match the "year to date" amounts on the last PLS, which show the separate results for each activity.  Table 6 shows selected information from the last PLS and shows the percentages for diesel fuel.

Table 6

| Category | Totals | Diesel Fuel | Diesel Fuel As Percent of Total |
|----------|--------|-------------|--------------------------------|
| (1) Income (Gross receipts) | $4,152,428 | $3,340,825 | 80.5 |
| (2) Cost of sales | 3,463,255 | 2,959,767 | 85.5 |
| Gross Profit ((1) minus (2)) | 689,173 | 381,058 | 55.3 |

## 3. Claimed Business Expenses

### A. Automobile Expenses

Petitioner had an American Express Corporate Card account, in the name of "ATN S Khatchatourian" (sic). Credit cards on this account were issued to Steve, Andy, Roubik Khachatourian (another brother of Steve's), Peter Soghomonia, and Carl Ledbetter. American Express monthly summary statements issued during 9 of the months of petitioner's fiscal 1990 show charges totaling about $15,220.

Petitioner owned a Mercedes 560SL automobile, hereinafter referred to as the Mercedes. Steve used the Mercedes as his personal car. Petitioner paid the expenses of the Mercedes.

On its fiscal 1990 tax return, petitioner claimed a $29,877 "car/truck" expenses deduction. In the notice of deficiency, respondent disallowed this entire amount.

### B. Rent Expenses

In 1987, petitioner, Steve, and Andy entered into a lease agreement under which Steve and Andy leased to petitioner the land on which petitioner's truck stop was located. Under this 5-year lease, petitioner was to pay $5,000 per month rent to Steve and Andy.

On his 1990 income tax return, Steve reported receiving $10,000 rent income from petitioner.

On its fiscal 1990 tax return, petitioner claimed a $101,517 rent expenses deduction. In the notice of deficiency, respondent disallowed $96,000 of this amount. At trial, respondent conceded that petitioner is entitled to deduct rent expenses of $15,517.

_____

All of the underpayment of tax for petitioner's fiscal 1990 is attributable to petitioner's negligence.

## OPINION

### I. Omitted Income

Petitioner argues that, although its records were incomplete, it demonstrated through the documents provided and through testimony that (1) petitioner sold 5,029,368 gallons of diesel fuel during fiscal 1990 and (2) the retail price per gallon of diesel fuel asserted by respondent is 30 cents higher than the price actually charged by petitioner. In fact, petitioner asserts, if appropriate adjustments were made to respondent's numbers, then they would show that petitioner overstated income by "approximately $30,000.00" (opening brief) or "23,571.00" (answering brief). Also, petitioner claims that the reason its records were incomplete is that many of the records were confiscated by the California Board of Equalization and never returned to petitioner.

Respondent argues that (1) the testimony and documents provided by petitioner are insufficient to establish that

- 15 -

respondent was not justified in reconstructing petitioner's gross receipts using the Lundberg Study, described infra, (2) the evidence and testimony provided by petitioner are inadequate to establish the amount of petitioner's gross income from the sale of diesel fuel, and (3) respondent's calculations (after concessions noted supra note 2) are supported by the evidence.

We agree, in general, with respondent.

A. Preliminary

Both sides agree that, during petitioner's fiscal 1990, petitioner (1) sold diesel fuel and gasoline and (2) operated, at its truck stop, a minimart and a coffee shop. Petitioner's fiscal 1990 tax return does not identify any income or deduction items as being related to a specific one of the foregoing activities. The parties have stipulated that the notice of deficiency adjustments for sales and cost of goods relate "solely to * * * diesel fuel." They also have stipulated to a profit and loss statement that breaks down gross receipts and cost of goods sold among the foregoing activities. Under the circumstances, we have interpreted petitioner's tax return and respondent's notice of deficiency as dealing with the amounts shown as "sales diesel" and "purch. diesel fuel" on the stipulated June 1990 PLS. Respondent does not dispute the correctness of the gross receipts and cost of goods sold of any nondiesel activity shown on the stipulated PLS's. See supra note 2.

B. Discussion

1. Justification for Reconstruction

Respondent's determinations as to matters of fact in the notice of deficiency are presumed to be correct, and petitioner has the burden of proving otherwise.  See Rule 142(a);[4] Welch v. Helvering, 290 U.S. 111, 115 (1933); Anson v. Commissioner, 328 F.2d 703, 706 (10th Cir. 1964), affg. Bassett v. Commissioner, T.C. Memo. 1963-10.

Gross income includes income derived from business.  See sec. 61(a)(2).  Every person subject to income tax is required to keep books and records that establish the amount of gross income and deductions shown by that person on that person's income tax return.  See sec. 6001;[5] sec. 1.6001-1(a), Income Tax Regs.[6]  If

---

[4]Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.

[5]Sec. 6001 provides, in pertinent part, as follows:

SEC. 6001.  NOTICE OR REGULATIONS REQUIRING RECORDS, STATEMENTS, AND SPECIAL RETURNS.

Every person liable for any tax imposed by this title [title 26, the Internal Revenue Code of 1986], or for the collection thereof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary may from time to time prescribe. * * *

[6]SEC. 1.6001-1 Records.

(a) In general.  Except as provided in paragraph (b) of this section [relating to farmers and wage-earners], any person subject to tax under subtitle A of the Code [relating
(continued...)

the books and records are regularly kept in the course of the taxpayer's business, then they will not be disregarded absent a showing that they are inadequate or erroneous.  See Lark Sales Co. v. Commissioner, 437 F.2d 1067, 1078 (7th Cir. 1970), affg. in part and revg. in part Medd v. Commissioner, T.C. Memo. 1968-244; Estate of Hill v. Commissioner, 59 T.C. 846, 857 (1973).

However, the Commissioner is not bound to accept a taxpayer's books and records at face value; the books and records may be more consistent than truthful.  See Holland v. United States, 348 U.S. 121, 132 (1954).  Even when the taxpayer keeps books and records that support the tax return as filed, an inquiry outside of the books and records may be necessary, because the books and records may support the tax return as filed yet omit taxable income.  See Campbell v. Guetersloh, 287 F.2d 878, 880 (5th Cir. 1961).

When a taxpayer fails to keep adequate records, the Commissioner is authorized to determine the existence and amount of the taxpayer's income by any method that clearly reflects income.  See sec. 446(b); Holland v. United States, supra; Mallette Bros. Const. Co., Inc. v. United States, 695 F.2d 145,

---

[6](...continued)
to income taxes] * * * shall keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information.

148 (5th Cir. 1983); Webb v. Commissioner, 394 F.2d 366, 371-372 (5th Cir. 1968), affg. T.C. Memo. 1966-81. The reconstruction of income need only be reasonable in light of all surrounding facts and circumstances. See Palmer v. Commissioner, 116 F.3d 1309, 1312 (9th Cir. 1997); Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970); Schroeder v. Commissioner, 40 T.C. 30, 33 (1963). The Commissioner has latitude in determining which method of reconstruction to apply when taxpayers fail to maintain adequate records. See Petzoldt v. Commissioner, 92 T.C. 661, 693 (1989). Once the Commissioner has reconstructed a taxpayer's income, the burden is on the taxpayer to demonstrate that the Commissioner's determination is excessive. See Mallette Bros. Const. Co., Inc. v. United States, 695 F.2d at 148; Giddio v. Commissioner, 54 T.C. at 1534.

Our examination of the materials in the record convinces us that petitioner's books and records as to diesel fuel sales contain sufficient inconsistencies with each other and with petitioner's tax return as to warrant respondent's efforts to reconstruct petitioner's income from this source. (As to petitioner's income from gasoline sales, the mini-mart, and the coffee shop, see supra A. Preliminary.)

Bedevian, who prepared petitioner's fiscal 1990 tax return, told Steve to keep petitioner's fuel pump computer tapes in a safe place. Steve did not give these tapes to Bedevian.

Roberts, Bedevian's successor as petitioner's accountant, did not receive these tapes until Steve gave them to Roberts after Andy sued Steve and petitioner. Before then, when Roberts asked for these tapes, Steve responded that these tapes had been destroyed. Thus, petitioner's fuel pump computer tapes were not relied on in the preparation of petitioner's fiscal 1990 tax return, Steve kept these tapes from petitioner's accountants, and the one bit of evidence we have as to these tapes' accuracy is Hart's mid-1988 comparison of one tape with that day's DSR which showed that that tape's total diesel sales amount was about $200 higher than the DSR's amount. We conclude that the evidence of record as to petitioner's fuel pump computer tapes supports respondent's determination to reconstruct petitioner's diesel fuel sales income.

Steve's early 1998 letters to respondent repudiated the MIR's in total, and the second letter repudiated each month's MIR. See supra text at tables 1 and 2. We conclude that the evidence of record as to petitioner's MIR's support respondent's determination to reconstruct petitioner's diesel fuel sales income.

Steve testified that petitioner's employees copied the fuel pump computer tapes information--gallons and dollars--onto the DSR's, and that the DSR's and fuel pump computer tapes were then sent on to Bedevian. Bedevian testified that he did not receive

the fuel pump computer tapes. Hart testified that Steve told him that he destroyed the fuel pump computer tapes after the information was copied onto the DSR's; the one fuel pump computer tape Hart examined was from the day immediately before the date that Hart asked for the fuel pump computer tape. In this clash of testimonies, we believe Bedevian and Hart. In any event, we do not have the fuel pump computer tapes that could have been used in auditing petitioner's fiscal 1990 tax return. As we have noted, the DSR's that we have do not match the MIR's that we have, as to diesel fuel gallons sold. The DSR's figures as to receipts from diesel fuel sales imply prices significantly less than the Lundberg Survey shows as retail diesel fuel prices in that part of the country at that time of year.[7] We conclude that the evidence of record as to petitioner's DSR's supports respondent's determination to reconstruct petitioner's diesel fuel sales income.

Respondent's determination that petitioner omitted gross income from its diesel fuel retail activity is the consequence of respondent's determination that petitioner underreported both its receipts from, and its cost of goods sold for, this activity. Respondent takes the position that the receipts underreporting far exceeds the cost underrporting--this excess is the measure of

---

[7]Compare _supra_ table 3 with _infra_ table 7.

petitioner's omitted income. See supra note 2. The foregoing books and records deal with the amount of petitioner's receipts; as indicated supra, we believe the flaws in those books and records justify respondent in reconstructing petitioner's income. The Purchase Logs deal with petitioner's costs. Although we have noticed flaws in these books and records as well, neither party challenges the overall accuracy or usefulness of this cost information. However, the Purchase Logs in the record herein cover less than half of petitioner's fiscal 1990.

We proceed, then, to evaluate respondent's reconstruction, the centerpiece of which is the report and testimony of Trilby Lundberg.

### 2. Reconstruction

Respondent reconstructed petitioner's diesel fuel gross income by making adjustments to gross receipts and cost of goods sold. We consider the elements of these items in the following order: (a) number of gallons sold, (b) sale price per gallon, and (c) number and price of gallons bought.

(a) Number of Gallons Sold. We conclude that of the different records of diesel fuel sales that petitioner maintained, the MIR's have the greatest appearance of correctness as to the number of gallons sold. Respondent chose to use the MIR's. Petitioner has not persuaded us that there is a better alternative.

We direct that, in the Rule 155 computation, the number of gallons of diesel fuel that petitioner sold each month during petitioner's fiscal 1990 shall be the number shown on table 1, supra. These numbers are the same as those respondent used, except in two respects. Firstly, as indicated supra in note 1 to table 1, our addition of the daily metered amounts leads to totals slightly less than respondent's totals. Secondly, we do not have an MIR for December 1989. Respondent averaged the totals for the other 11 months to derive a December amount. Because of seasonal trends in fuel sales, we conclude that it is preferable to derive a December amount by averaging the totals for the adjoining months (Nov. 1989 and Jan. 1990) as shown in table 1, rather than averaging all 11 months.

On opening brief, petitioner contends as follows:

> Petitioner contends that it only sold 5,029,368 gallons of diesel fuel during the tax year ending June 30, 1990. The Respondent estimated the number of gallons of diesel fuel sold for the tax year ending June 30, 1990 by averaging the actual gallons sold per month for seven months and extending it out for a period of 12 months. Respondent's method of determining the claimed gallons sold again was unreliable and inaccurate as appeared from the testimony of Steve Khachatourian who testified as to the actual gallons sold.

We reject petitioner's contention for the following reasons. Firstly, contrary to petitioner's contention, respondent proposes to use petitioner's MIR's for the 11 months for which those records are available, and averaging those 11 months' amounts to provide an amount for the month for which we do not have an MIR--

December 1989.  This is what the record shows.  See supra table 1.  This is what respondent's agent plainly testified to at trial, when she painstakingly reviewed each month's sales figures as shown on the MIR's.  Petitioner's contention as to respondent's position is contradicted by the record.[8]  Secondly, petitioner's contention that it sold "only * * * 5,029,368 gallons of diesel fuel during the tax year ending June 30, 1990", is contradicted by Steve's March 5, 1998, letter to respondent stating that petitioner sold 5,111,954 gallons of diesel fuel during petitioner's fiscal 1990.  See supra table 2 and associated text.  Petitioner has not explained the roughly 82-thousand-gallon discrepancy between Steve's letter and its contention on brief.  Thirdly, petitioner has failed to direct our attention to anything in the record supporting its position on brief that it sold only 5,029,368 gallons.  We have unsuccessfully searched the record, giving special care to Steve's testimony, for evidence supporting petitioner's contention.  We note that petitioner does not repeat this contention in its answering brief.

In light of the record herein, including the contradictions among petitioner's books and records and the statements in

---

[8]A stipulated exhibit suggests that the income reconstruction in the notice of deficiency may have been prepared on the basis that petitioner describes.  However, respondent abandoned that position.  See supra note 2.

Steve's letter, we conclude that respondent's reconstruction, as we have slightly modified it, is the best that can be done to determine how much diesel fuel petitioner sold during its fiscal 1990.

(b) Sale Price Per Gallon. Steve testified that, each day, petitioner's employees copied from the fuel pump computer tapes onto the DSR's the totals of diesel fuel sales in gallons and in dollar receipts. Steve testified that, each month, he sent to Bedevian the DSR for that month, together with the fuel pump computer tapes for that month. Bedevian testified that he told Steve to keep the fuel pump computer tapes as a backup that would be needed if petitioner were audited, and that Bedevian never received any fuel pump computer tapes. Roberts testified that he did not begin to receive fuel pump computer tapes until Andy filed a lawsuit against petitioner and Steve some time after the end of the year in issue. As we have noted, the DSR's differed substantially from the MIR's as to the numbers of gallons sold. See supra tables 1 and 3. In light of this conflict of evidence and the absence of backup evidence for the amounts of receipts listed in the DSR's, we conclude that the record in the instant case does not include any credible support for the diesel fuel sales receipts amounts shown on petitioner's PLS's and folded into petitioner's fiscal 1990 tax return. See supra A. Preliminary.

In such circumstances, the Courts have found the use of statistical information appropriate.[9]  See, e.g, Pollard v. Commissioner, 786 F.2d 1063, 1066 (11th Cir. 1986)(approving the Commissioner's income determination based on a Bureau of Labor Statistics report that indicated the cost of living in a particular geographical area), affg. T.C. Memo. 1984-536; Edwards v. Commissioner, 680 F.2d 1268, 1270-1271 (9th Cir. 1982)(approving the Commissioner's use of the Consumer Price Index to determine income for the years in issue based on income reported on the taxpayer's earlier year's tax return), affg. an unreported order of this Court; Giddio v. Commissioner, 54 T.C. at 1532-1533 (approving the Commissioner's income determination based on a Bureau of Labor Statistics report that indicated the cost of living in a particular geographic area); see also Barragan v. Commissioner, T.C. Memo. 1993-92 (approving the Commissioner's reconstruction of the taxpayer's gasoline station gross receipts based on Lundberg Survey's semimonthly listing of

---

[9]Sec. 7491(b), relating to burden of proof with respect to income reconstruction "solely through the use of statistical information on unrelated taxpayers", as enacted by sec. 3001 of the Internal Revenue Service Restructuring and Reform Act of 1998 (1998 Act), Pub. L. 105-206, 112 Stat. 685, 726-727, does not apply to the instant case for two reasons, as follows:  (1) Petitioner is a corporation and the provision applies only to individual taxpayers, and (2) the examination in the instant case began before July 22, 1998, the effective date of sec. 7491(b) applicable to court proceedings in which there has been an examination.  See the 1998 Act, sec. 3001(c)(1), 112 Stat. at 727.

average gasoline prices in a specified area of California), affd. without published opinion 69 F.3d 543 (9th Cir. 1995).

Respondent presented the expert report and testimony of Trilby Lundberg (hereinafter sometimes referred to as Lundberg), of Lundberg Survey, Inc., and publisher of the Lundberg Letter. Lundberg Survey, Inc., is an independent, market research company specializing in the U.S. petroleum and related industries, in business since the early 1950's gathering and publishing fuel price surveys, service station population studies, branded market share reports, and other statistics. The Lundberg Letter is a semimonthly single-subject periodical consisting mainly of Lundberg Survey data and text descriptions of market developments.

The results of Lundberg's semimonthly survey of retail diesel fuel sale prices in the Fresno/Clovis, California area for the year in issue resulted in the average prices (cents per gallon), including taxes, shown in table 7.

Table 7

| Date | Full-Service | Self-Service |
|------|--------------|--------------|
| 7/7/89 | 125.10 | 113.65 |
| 7/21/89 | 125.10 | 110.65 |
| 8/11/89 | 124.70 | 107.90 |
| 8/25/89 | 124.70 | 105.90 |
| 9/8/89 | 124.70 | 105.90 |
| 9/22/89 | 124.30 | 107.40 |
| 10/6/89 | 122.30 | 106.90 |
| 10/20/89 | 122.30 | 109.15 |
| 11/3/89 | 122.30 | 112.15 |
| 11/17/89 | 122.30 | 112.40 |
| 12/1/89 | 122.30 | 112.40 |
| 12/15/89 | 122.30 | 111.15 |
| 1/5/90 | 123.30 | 111.90 |
| 1/19/90 | 123.30 | 111.90 |

(Continued)
Table 7

| Date | Full-Service | Self-Service |
|------|-------------|--------------|
| 2/9/90 | 123.30 | 110.65 |
| 2/23/90 | 123.30 | 110.90 |
| 3/9/90 | 123.30 | 111.65 |
| 3/23/90 | 123.90 | 110.15 |
| 4/6/90 | 123.90 | 110.65 |
| 4/20/90 | 123.90 | 111.65 |
| 5/4/90 | 123.90 | 112.40 |
| 5/18/90 | 123.90 | 112.40 |
| 6/8/90 | 123.90 | 112.65 |
| 6/22/90 | 123.90 | 112.65 |

Respondent averaged the Lundberg self-service semimonthly amounts to determine an average sale price for each month.[10] In order to facilitate comparison with petitioner's cost information, which was net of Federal and California excise taxes and California and county sales taxes, respondent's agent subtracted 29 cents per gallon, and arrived at the monthly net sale prices shown in table 8.

Table 8

| Month | Adjusted Lundberg Price Per Gallon |
|-------|-----------------------------------|
| July 1989 | $0.83 |
| August 1989 | 0.78 |
| September 1989 | 0.78 |
| October 1989 | 0.79 |
| November 1989 | 0.83 |
| December 1989 | 0.83 |
| January 1990 | 0.83 |
| February 1990 | 0.82 |
| March 1990 | 0.82 |
| April 1990 | 0.82 |
| May 1990 | 0.83 |
| June 1990 | 0.84 |

---

[10]Both respondent's counsel and respondent's agent who testified as to how respondent calculated the amount of the omitted income referred to the Lundberg amounts as "biweekly". It is evident from Lundberg's report, supra table 7, and the agent's description that the Lundberg amounts were "semimonthly".

We approve of respondent's use of the Lundberg report in reconstructing petitioner's diesel fuel gross receipts, with the following two modifications:  Firstly, the parties stipulated that the combined California and county sales taxes rate was 6 percent during the period July 1 through November 30, 1989, and was 6¼ percent during the period December 1, 1989, through June 30, 1990.  Respondent's determination to subtract 29 cents per gallon to reflect the total excise and sales taxes is upheld for the first 5 months of petitioner's fiscal 1990.  However, for the remaining 7 months of petitioner's fiscal 1990, when the 6¼ percent sales taxes total was in effect, the shrinking out of the excise and sales taxes shall be accomplished by subtracting 30 cents per gallon.  Secondly, respondent rounded the Lundberg report numbers to the nearest whole cent per gallon.  This seems to have resulted in a slight upward bias that appears to accumulate to several thousand dollars.  We direct that the calculations shall be accomplished by rounding the Lundberg report numbers to the nearest tenth of a cent per gallon.

At trial, Steve testified that petitioner marked up the diesel fuel by an average of three cents per gallon.  However, it is clear from the last PLS and petitioner's fiscal 1990 tax return that petitioner reported a markup of more than seven cents per gallon.  See supra table 6.  Once again, Steve's testimony contradicts petitioner's books and records.

On opening brief, petitioner charges that "the Respondent utilized the full service price average [from Lundberg's report] as opposed to the self-service price." Petitioner states that "From the unrebutted testimony of Steve Khachatourian, all sales of diesel fuel from Petitioner's place of business was by self-service." However, at trial respondent's agent made it plain that she used the self-service prices from Lundberg's report, and not the full service prices, to reconstruct petitioner's diesel fuel gross receipts. The numbers in Lundberg's report and in the reconstruction of petitioner's income match respondent's agent's testimony. Our understanding of what was done in respondent's reconstruction of petitioner's income on this point matches respondent's agent's testimony. Petitioner apparently has completely misunderstood the record on this point, much as it misunderstood the record regarding the reconstruction of the number of gallons of diesel fuel that it sold, discussed supra.

On opening brief, petitioner contends as follows:

The testimony of Petitioner through Steve Khachatourian demonstrated that the diesel sales price attributed to Petitioner and utilized by Respondent in assessing the deficiencies and penalties was inaccurate and unreliable and were approximately 30 cents per gallon in excess of that actually charged by Petitioner during the 1990 tax year. Specific examples of sales in the month of June, as remembered by Steve Khachatourian through actual sales receipts produced at time of trial demonstrated that Petitioner sold diesel fuel in the month of June at a price of 90 cents per gallon which was 30 cents less per gallon than the $1.20 being ascribed to Petitioner for the same period of time. There is no valid reason stated by Respondent as to why prices in the Fresno/Clovis area

(Fresno County) were utilized for estimates of prices in Le Grand, California (Merced County) and why the Respondent utilized the full service price average as opposed to the self-service price.

We reject petitioner's contentions for the following reasons: Firstly, we have carefully reexamined Steve's testimony and do not find any testimony by him about (a) a 30-cents-per-gallon differential or (b) sales in June; as usual, petitioner has not directed our attention to any specific part of the record in connection with these contentions. Secondly, the DSR's described supra table 3 differ from the Lundberg study amounts (supra table 7) by 13 to 25 cents per gallon, averaging a difference of 18 cents per gallon, substantially less than petitioner's claim of a difference of 30 cents per gallon. Thirdly, at trial, petitioner produced what purported to be several charge card sales receipts and two fuel pump computer tapes, which Steve first presented to respondent's counsel that morning. The parties had stipulated that petitioner did not have any "records regarding fuel sales for the tax year ended June 30, 1990", apart from the records already stipulated. The Court sustained respondent's motion to strike the documents and related testimony because (1) the documents had not been timely provided to respondent under the Court's standing pretrial order, (2) the documents were provided to respondent for the first time late in the morning of the first day of the trial--too late for respondent to check the documents' accuracy, or even

authenticity, or otherwise to explore the significance of what was written on the documents, and (3) the documents were so fragmentary (charge card sales receipts for certain days in January, February, and March 1990, and partial fuel pump computer tapes for 2 days in June 1990) that they may not have been typical of the usual run of petitioner's diesel fuel operations. There is not any part of Steve's testimony, whether or not stricken under the Court's ruling, that relates to the fuel pump computer tapes or anything else occurring in June 1990.

Fourthly, Lundberg testified that her organization did not survey prices in Merced County during petitioner's fiscal 1990, but that typically prices in more rural areas are higher than they are in more concentrated metro areas.  Based on Steve's comments about the areas where Lundberg's surveys were conducted and where petitioner conducted its diesel fuel sales business, we conclude that, if Merced County diesel fuel prices were different from the surveyed diesel fuel prices in the Fresno County area, then it is more likely than not that the Merced County diesel fuel prices would be higher than the Fresno County diesel fuel prices that showed up in the Lundberg survey.  Thus, it is more likely than not that petitioner was helped rather than hurt by the use of a Fresno County survey rather than a Merced County survey.

Fifthly, at trial respondent's agent made it plain that she used the self-service prices from Lundberg's report, and not the full

service prices, to reconstruct petitioner's diesel fuel gross receipts. The numbers in Lundberg's report and in the reconstruction of petitioner's income match respondent's agent's testimony. Our understanding of what was done in respondent's reconstruction of petitioner's income on this point matches respondent's agent's testimony. Petitioner apparently has completely misunderstood the record on this point, much as it misunderstood the record regarding the reconstruction of the number of gallons of diesel fuel that it sold, discussed supra.

Thus, every part of petitioner's expressed concern is either flatly contradicted by the record or (contrary to petitioner's assertion) not addressed in the record; the record does not support any part of petitioner's expressed concern.

In light of the record herein we conclude that respondent's reconstruction, as we have slightly modified it, is the best that can be done to determine the prices at which petitioner sold diesel fuel during petitioner's fiscal 1990.

(c) Cost of Goods Sold. Respondent has explained the reconstruction of petitioner's cost of goods sold with regard to diesel fuel as the product of (1) the number of gallons petitioner bought in petitioner's fiscal 1990--an amount equal to the number of gallons petitioner sold that year, and (2) the average price per gallon that petitioner paid--an amount equal to the average cost shown on petitioner's incomplete purchase

records.  As noted supra note 2, respondent's approach results in petitioner's cost of goods sold being $82,691 more than the amount claimed on petitioner's tax return.

On brief, petitioner claims at one point that only 5,029,368 gallons of diesel fuel were sold during petitioner's fiscal 1990, but elsewhere petitioner appears to accept respondent's approach to determining the number of gallons of diesel fuel it bought and how much petitioner paid for that diesel fuel.  We note that petitioner does not ask us to hold that the cost of goods sold as to diesel fuel is different from that claimed by respondent.

Petitioner does not claim to have bought more diesel fuel than it sold (e.g., because of evaporation or theft).  Petitioner does not suggest any way in which we should or could arrive at monthly cost averages to be applied to varying purchase amounts-- in contrast to what we have done with regard to gallons of diesel fuel sales and sale prices.  Neither side suggests that opening and closing inventory (ordinarily an essential element in calculating cost of goods sold) should be accounted for in the instant case.

Under the circumstances, we uphold respondent's approach as to petitioner's diesel fuel sales cost of goods sold.

(d) Conclusions.

Based on the foregoing, we hold for respondent on this issue, except as to the slight modifications described supra.

## II. Business Expenses

### A. Preliminary

On its fiscal 1990 tax return, petitioner claimed business expense deductions of $689,658. In the notice of deficiency respondent disallowed only the following business expense deduction items: Rents--$96,000 out of $101,517 claimed, and Car/Truck--all of the $29,877 claimed. Respondent did not disturb the remaining $563,781 of claimed deductions. At trial, respondent conceded an additional $10,000 of the claimed rent expenses, leaving $86,000 in disputed rent expenses.

The parties stipulated monthly summaries of a credit card account in Steve's name, a copy of a "purported lease between petitioner and its officers, Steve * * * and Andy * * * ", and a deposition Steve gave in a suit by Andy against petitioner and Steve. Also, Steve provided some testimony on the subject.

At the end of the trial, the Court directed the parties to file simultaneous briefs and took the trouble to explain to Steve the purpose of posttrial briefs, in particular the purpose and detailed format of requests for findings of fact and statements as to where in the record is the support for each proposed finding of fact. See Rule 151.[11]

---

[11]Rule 151 provides, in pertinent part, as follows:

RULE 151. BRIEFS

(continued...)

On opening brief petitioner did not propose any findings of fact or present any argument regarding the business expense deductions. Petitioner evidently concluded that the business expense deduction disputes were not worth the necessary effort. In violation of the Court's specific directions and explanation, neither of petitioner's briefs includes proposed findings of fact, or objections to respondent's proposed findings of fact, as to the business expense deduction disputes. However, on answering brief petitioner did include a short contention that it is entitled to a rent expense deduction "at a minimum * * * of

---

[11](...continued)
  *   *   *   *   *   *   *

 (e) Form and Content: <u>All briefs</u> shall conform to the requirements of Rule 23 and <u>shall contain</u> the following in the order indicated:

  *   *   *   *   *   *   *

 (3) Proposed findings of fact (in the opening brief or briefs), based on the evidence, <u>in the form of numbered statements</u>, each of which shall be complete and shall consist of a concise statement of essential fact and not a recital of testimony nor a discussion or argument relating to the evidence or the law. <u>In each such numbered statement, there shall be inserted references to the pages of the transcript or the exhibits or other sources relied upon to support the statement</u>. In an answering or reply brief, the party <u>shall set forth</u> any objections, together with the reasons therefor, to any proposed findings of any other party, <u>showing the numbers of the statements to which the objections are directed</u>; in addition, the party may set forth alternative proposed findings of fact. [Emphasis added.]

$60,000", and an automobile expense deduction of $15,220, conceding the remaining $14,657 of that issue.

We have the power to treat as a default petitioner's failure to comply with the Court's rules and our specific oral directive. See Stringer v. Commissioner, 84 T.C. 693, 704-708 (1985), affd. without published opinion 789 F.2d 917 (4th Cir. 1986).  However, petitioner's actions have not been as egregious as those of the taxpayers and their counsel in Stringer.  Also, we must recognize petitioner's pro se status; Steve was not a lawyer.  Accordingly we shall not default petitioner on these deductions.

However, petitioner's complete omission of this matter from its opening brief has had the effect of preventing respondent from replying to petitioner's contentions.

We conclude that, in the circumstances of the instant case, we shall not dismiss petitioner on the issue of business expense deductions--rather, we shall treat petitioner as having conclusively admitted the correctness of respondent's proposed findings of fact bearing on the business expense deductions, except to the extent that petitioner's statements in its answering brief are clearly inconsistent therewith, in which event we have resolved the inconsistencies based on our understanding of the record as a whole.  See Estate of Jung v. Commissioner, 101 T.C. 412, 413 n.2 (1993).

B. Automobile Expenses

Respondent contends that, under section 162(a), petitioner is not entitled to the disputed automobile business expense deduction because petitioner (a) failed to substantiate that the expenses (1) were incurred and (2) were ordinary and necessary expenses of petitioner's trade or business, and (b) failed to meet the strict record-keeping requirements of section 274(d).

Petitioner maintains that the requirements of section 162(a) are satisfied, at least to the extent of $15,220, the total of the charges on the nine American Express monthly statements in the record.

We agree with respondent.

A taxpayer seeking a deduction has the burden of overcoming the presumption of correctness that attaches to the Commissioner's factual determinations in the notice of deficiency. See Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". E.g., Lucas v. Commissioner, 79 T.C. 1, 6 (1982). Under section 6001 and section 1.6001-(a) and (e), Income Tax Regs., a taxpayer must keep such permanent books of account or records as are sufficient to establish the

amount of gross income, deductions, credits, or other matters required to be shown on the tax return.  If the books and records are not adequate to establish the amounts of deductions or credits, but we are persuaded that the taxpayer is entitled to deduct more than the Commissioner allowed, then we are required to make some estimate of how much more should be allowed, "bearing heavily if * * * [we choose] upon the taxpayer whose inexactitude is of his own making."  Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930).  However, sections 274(d) and 280F(d)(4) provide that no deduction shall be allowed with respect to passenger automobiles or any other property used as a means of transportation unless the taxpayer substantiates certain matters by adequate records or by sufficient records corroborating the taxpayer's own statement.  There is no leeway for Cohan type approximations under section 274(d).  See Sanford v. Commissioner, 50 T.C. 823, 827-828 (1968), affd. 412 F.2d 201 (2d Cir. 1969).

We are satisfied that petitioner paid about $15,220 for 9 months' worth of American Express credit card charges.  We may fairly assume that petitioner paid additional amounts for the other 3 months' charges.  But we do not have information that persuades us that it is more likely than not that any of these paid amounts satisfy the requirements of section 162(a) as automobile expenses, and, as far as we can tell, the record is

devoid of any evidence that any of these expenses satisfy the heightened substantiation requirements of section 274(d).

We hold for respondent on this issue.

C. Rent Expenses

Respondent contends that, under section 162(a), petitioner is not entitled to the disputed rent business expenses deduction because petitioner has failed to substantiate that the expenses (1) were incurred and (2) were ordinary and necessary expenses of petitioner's trade or business.

Petitioner maintains that the requirements of section 162(a) are satisfied.

We agree with respondent.

A taxpayer seeking a deduction has the burden of overcoming the presumption of correctness that attaches to the Commissioner's factual determinations in the notice of deficiency.  See Rule 142(a); New Colonial Ice Co. v. Helvering, supra; Welch v. Helvering, supra.

Section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  See, e.g., Lucas v. Commissioner, supra.  Under section 6001 and section 1.6001-1(a) and (e), Income Tax Regs., a taxpayer must keep such permanent books of account or records as are sufficient to establish the amount of gross income, deductions, credit, or other matters

required to be shown on the tax return. If the books and records are not adequate to establish the amounts of deductions or credits, but we are persuaded that petitioner is entitled to deduct more than respondent allowed, then we are required to make some estimate of how much more should be allowed, "bearing heavily if * * * [we choose] upon the taxpayer whose inexactitude is of his own making." Cohan v. Commissioner, 39 F.2d at 543-544.

Respondent allows or concedes $15,517 ($5,517 allowed in the notice of deficiency; $10,000 conceded at trial) of the claimed $101,517 rent expenses deduction. The only evidence suggesting a greater deduction is the lease, which required petitioner to pay a total of $60,000 to Steve and Andy during petitioner's fiscal 1990. Weighing against petitioner are the following: (1) Petitioner has not directed us to, and we have not found, any evidence in the record that petitioner actually made the payments that the lease required. Also, the lessors, Steve and Andy, were petitioner's sole shareholders, and transactions between related parties are subject to close scrutiny. See Maxwell v. Commissioner, 95 T.C. 107, 116 (1990), and cases cited therein. (2) Steve stated that he and Andy received the same amount of rent income from petitioner. Steve reported only $10,000 of rent income from petitioner on his 1990 tax return. (3) Steve said that the rent arrangement he and Andy had with petitioner was

often used interchangeably with compensation.  Respondent did not disallow any part of petitioner's compensation expense deduction. (4) Neither Steve, who had signed, nor Bedevian, who had prepared petitioner's fiscal 1990 tax return, both of whom testified, provided us with evidence as to what were the intended components of petitioner's claimed $101,517 rent expenses deduction.

Based on the foregoing we conclude that petitioner has failed to persuade us that it is more likely than not that petitioner's deductible rent expenses exceed $15,517.

We hold for respondent on this issue.

### III. Section 6662

Respondent determined that petitioner is liable for an accuracy-related penalty for negligence in the amount of 20 percent of the entire underpayment.  Respondent contends that "petitioner failed to exercise due care or do what a reasonable and ordinarily prudent person would do under the circumstances." Alternatively, respondent contends that petitioner is liable for an accuracy-related penalty in the amount of 20 percent of the entire underpayment for substantial understatement of tax.

Petitioner maintains that it has no deficiency and therefore is not liable for an accuracy-related penalty under section 6662.

We agree with respondent.

Section 6662[12] imposes an accuracy-related penalty if any part of an underpayment of tax is due to negligence or intentional disregard of the rules. See subsecs. (a) and (b)(1) of sec. 6662. Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. See sec. 6662(c); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Negligence also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly. See sec. 1.6662-3(b)(1), Income Tax Regs.

---

[12]Sec. 6662 provides, in pertinent part, as follows:

SEC. 6662. IMPOSITION OF ACCURACY-RELATED PENALTY.

(a) Imposition of Penalty.--If this section applies to any portion of an underpayment of tax required to be shown on a return, there shall be added to the tax an amount equal to 20 percent of the portion of the underpayment to which this section applies.

(b) Portion of Underpayment to Which Section Applies.-- This section shall apply to the portion of any underpayment which is attributable to 1 or more of the following:

(1) Negligence or disregard of rules or regulations.

* * * * * * *

(c) Negligence.--For purposes of this section, the term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of this title [title 26, the Internal Revenue Code], and the term "disregard" includes any careless, reckless, or intentional disregard.

Section 6001 and section 1.6001-1(a) and (e), Income Tax Regs., require taxpayers to keep such permanent books of account or records as are sufficient to establish the amount of gross income, deductions, credits or other matters required to be shown on their tax returns.  The books and records that petitioner maintained for its fiscal 1990 were so inconsistent with each other as to be inadequate to establish petitioner's diesel fuel gross receipts and cost of goods sold, which are required to be reported on petitioner's income tax return.  There is no evidence in the record that petitioner kept any meaningful books and records as to automobile expenses and rent expenses.

Petitioner's failure to keep adequate records under these circumstances constitutes negligence.  See Stovall v. Commissioner, 762 F.2d 891, 895 (11th Cir. 1985), affg. T.C. Memo. 1983-450; Zivnuska v. Commissioner, 33 T.C. 226, 239-241 (1959).  This negligence resulted in the entire deficiency for petitioner's fiscal 1990.  In the instant case, petitioner's underpayment, for purposes of section 6662, is the same as petitioner's deficiency.  Accordingly, we conclude and we have found that petitioner has an underpayment for its fiscal 1990 and that all of this underpayment is due to negligence.

We hold for respondent on this issue.[13]

---

[13]Because of our determination as to the negligence, etc., penalty, it is not necessary for us to rule on respondent's
(continued...)

To take account of the foregoing, and respondent's concessions, see <u>supra</u> note 2.

<u>Decision will be entered</u>

<u>under Rule 155</u>.

---

[13](...continued) determination in the notice of deficiency as to substantial understatement of income tax.  See sec. 1.6662-2(c), Income Tax Regs.